2022 IL App (2d) 200450-U
No. 2-20-0450
Order filed July 13, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| 895 WOOD DALE, LLC, | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 18-MR-1680 |
| | ) | |
| CITY OF WOOD DALE, | ) | Honorable |
| | ) | Paul M. Fullerton, |
| Defendant-Appellee. | ) | Judge, Presiding. |

_____

PRESIDING JUSTICE BRIDGES delivered the judgment of the court.
Justices McLaren and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The City of Wood Dale Administrative Adjudication did not err in finding that the City was not equitably estopped from requiring plaintiff to install landscape islands in accordance with the City's landscaping ordinance before issuing plaintiff a business license. Therefore, we affirm.

¶ 2    On June 21, 2018, defendant, the City of Wood Dale (City), cited plaintiff, 895 Wood Dale, LLC, for operating a commercial truck parking lot without a business license. Plaintiff had applied for a renewal of its business license on October 2, 2017, but the City denied the application based on violations of the City's municipal code that were observed during an on-site inspection of the parking lot. Pertinently, the parking lot lacked interior landscape islands and perimeter landscaping

as required by the City's municipal code governing "Landscaping And Tree Preservation." Plaintiff rectified most of the other violations identified in the citation but did not install any landscape islands or perimeter landscaping.

¶ 3    On November 1, 2018, after an administrative hearing before the City of Wood Dale Administrative Adjudication, a hearing officer found plaintiff liable for failure to obtain a business license and imposed a $500 fine. In so ruling, the hearing officer rejected plaintiff's argument that the City was estopped from requiring compliance with the landscape requirements as a precondition to the issuance of a business license. In making its equitable estoppel argument, plaintiff stressed that the civil engineering drawings it submitted to the City for approval lacked these features, but the City nevertheless approved the drawings and issued plaintiff a building permit anyway. On administrative review, the circuit court of Du Page County affirmed the hearing officer's determination. For the following reasons, we affirm.

¶ 4                    I. MOTION TAKEN WITH CASE

¶ 5    As a preliminary matter we address the City's motion to submit supplemental materials. The city seeks to submit supplemental materials stemming from a 2020 administrative decision which also addressed plaintiff's failure to install landscape islands. The City maintains that these materials are relevant to the *res judicata* arguments advanced in its brief.

¶ 6    Plaintiff argues that section 3-110 of the Code of Civil Procedure (735 ILCS 5/3-110 (West 2020)) bars us from considering evidence not raised before the administrative agency. However, we do not believe that section 3-110 bars us from considering matters outside the record in the context of *res judicata* and mootness. See *Dancor Construction, Inc. v. FXR Construction, Inc.*, 2016 IL App (2d) 150839, ¶ 60 (collateral estoppel may be argued for the first time on appeal where the argument was unavailable at trial); *In re Marriage of Dowd*, 214 Ill. App. 3d 156, 157

(1991) ("matters *dehors* the record can be considered insofar as they concern the question of mootness"); see also *City of Centralia v. Garland*, 2019 IL App (5th) 180439, ¶ 10 ("It is well-established that this court can take judicial notice of matters that are readily verifiable from sources of indisputable accuracy, such as public records.") Accordingly, the City's motion to supplement is granted.

¶ 7                                      II. BACKGROUND

¶ 8      The following facts are largely uncontested. Plaintiff owns property consisting of approximately eight acres of land located at 895 N. Wood Dale Road in Wood Dale (subject property). The subject property is just south of the Elgin-O'Hare Tollway. It was acquired in either 1995 or 1996, at a time when the subject property was vacant and undeveloped.

¶ 9      At the administrative hearing, Mariann Gullo testified that she was employed by Gullo International Development Corporation, which owned plaintiff. Gullo testified that the parking lot was intended to operate only on a temporary basis, and she opined that the subject property was "a prime piece of property." She testified that the long-term plan was to develop the subject property with an industrial or commercial building, or perhaps a hotel, but that it was not yet feasible to develop it with a physical structure because of the market that they were in and the ongoing construction on the Elgin-O'Hare Tollway. Plaintiff therefore decided to "do something temporary" by operating the parking lot on the subject property, in order to generate some cash flow. Gullo originally wished to install a parking lot made of gravel, but the City insisted that the lot be engineered, built of asphalt, and developed via a process like "everybody else would go through." Gullo testified that, as a result, construction of the parking lot was more expensive than originally anticipated.

¶ 10     On October 12, 2011, plaintiff submitted to the City an application for a building permit requesting authorization to construct a 180-parking space commercial truck asphalt parking lot on the subject property. The building permit application was prepared by Mark Dudek, who was employed by Gullo International and who acted as property manager for the subject property. He was educated as an architect, and he was licensed in Florida but not in Illinois. Dudek was generally responsible for the permit application and the communications with the City during the permitting process. He included with the application a number of documents, including civil engineering drawings, an engineer's cost opinion, and a signed "Owners Certificate" certifying that the project would "be constructed in accordance with the released documents and applicable codes and ordinances of the City." Plaintiff's initial engineer's cost opinion for the project was approximately $130,000, which included full engineering drawings and stormwater detention on the subject property. Plaintiff also posted a bond with the City.

¶ 11     Dudek testified that, at the time he applied for a building permit, the City did not inform him that the City's code required that landscape islands and perimeter landscaping be constructed on the subject property. Gullo similarly testified that she could not recall the City informing her that landscape islands were required at that time, and that plaintiff relied on the City to inform it "as to what the requirements were going to be for the development." Gullo testified that if she had known when the building permit application was submitted that landscape islands would be required on the subject property, "at some point it just wouldn't have made sense to develop." She noted that landscape islands would reduce the number of parking spaces that plaintiff could lease to tenants, and it would have increased construction costs. The parties agree on appeal that, at all relevant times, the City's municipal code required landscape islands and perimeter landscaping on the subject property due to its nature as a commercial truck parking lot.

¶ 12    On October 25, 2011, the City granted the permit application and issued plaintiff a building permit to construct the parking lot. The building permit stated that it was authorized by "JF/PB." Dudek testified that "JF" meant John Forrest, who was the director of the Community Development Department (Department) for the City. Dudek testified that, at that point, no one from the City mentioned to him anything about landscape islands and perimeter landscaping, nor was there any notation on the approved drawings that they were required. Similarly, Dudek testified that there were no notations on the approved plans or building permit that the permitted use of the subject property as a parking lot was for a temporary basis, or that the landscape islands and perimeter landscaping would be required in the future.

¶ 13    On November 29, 2011, Dudek received correspondence from the City informing him that it was still holding the building permit pending the payment of a deposit fee and inquiring as to the timeframe for picking up the permit. Dudek replied the following day that he would retrieve the permit after the first of the year because the building season had effectively ended for 2011. It is unclear from the record when construction commenced or how long it took.

¶ 14    On January 28, 2013, Dudek requested that the City grant an extension of the building permit. The City granted the request and extended the expiration of the building permit to April 2, 2015.

¶ 15    In September 2013, the City inquired of plaintiff as to its long-term development plans for the subject property. On September 25, 2013, Dudek replied:

> "The desired term that we are seeking for the truck parking for [the subject property] will be four years from receipt of permits[,] which we estimate to run simultaneously with the construction work for the Elgin-O'Hare Tollway[,] which is estimated to be completed in 2018."

Consistent with that assertion, Dudek testified that he informed the City that plaintiff intended to operate the commercial truck parking lot while marketing it "to get a development there once it happens." In other words, plaintiff's goal was to operate the parking lot until it could find a suitable future development to go on the site, which it expected would coincide with the completion of construction on the Elgin-O'Hare Tollway. "The goal was *** to find a development to go on this site."

¶ 16    On December 3, 2014, after the parking lot was completed—sans landscape islands or perimeter landscaping—the City sent Dudek correspondence stating that all of the work performed at the subject property under the building permit substantially complied with the approved plan as submitted. Accordingly, the City authorized the release of plaintiff's bond, which plaintiff received.

¶ 17    Plaintiff thereafter began operating the subject property as a commercial truck parking lot. Gullo testified at the administrative hearing that parking spaces are leased to individual owner-operators of commercial trucks on a month-to-month basis. She explained:

> "The reason we do month-to-month is right in line with what I'm saying. If a development did come that was worthy of a development, we would be able to cancel these leases and be free to move forward with what we wanted. That's why they are month-to-month."

Dudek testified that the trucks are "meant to come in and go out," in that the trucks may be there "some time," perhaps overnight. A copy of the "Vehicle Parking Lease Agreement" was admitted into evidence, and it prohibited lessees from performing mechanical work or repairs on the subject property, as well as prohibited the dumping of garbage, discarded tires, and the like.

¶ 18    In November 2016, the City passed an ordinance requiring certain types of businesses within its corporate limits to obtain an annual business license in order to operate. Plaintiff was required to obtain a business license because it was engaged in "Commercial Land Leasing" under the City's municipal code. The City issued petitioner a business license to operate the subject property for the 2016 calendar year, as well as a business license in 2017 that was valid from January 1, 2017, through October 31, 2017.

¶ 19    On October 2, 2017, plaintiff applied for a renewal of its business license to continue operating the subject property as a commercial truck parking lot. Kelly Chrisse, assistant director for the Department, testified at the administrative hearing. She had worked for the City for three years, and thus was not yet employed with the City when it issued plaintiff a building permit to construct the parking lot in 2011. Chrisse testified that, after she received plaintiff's October 2, 2017, application for an annual business license, she performed an on-site inspection of the subject property to determine if there were any violations of the City's municipal code. The portion of the City's municipal code governing annual business licenses for businesses engaged in commercial land leasing, such as plaintiff, required inspection of the premises prior to the issuance of a business license and prohibited the issuance of a license until "all noted violations of [Chapter Four of the Municipal Code] and other applicable ordinances have been remedied." City of Wood Dale Municipal Code § 4.302(E) (added June 19, 2018). Chrisse discovered several code violations at the subject property, which she identified in a letter that she sent plaintiff on October 24, 2017.

¶ 20    On June 21, 2018, the City issued plaintiff a City code violation notice and notice to appear at an administrative hearing stemming from plaintiff's operation of the subject property as a commercial truck parking lot without a business license for the registration period of November 1, 2017, through October 31, 2018. The notice was accompanied by another letter from Chrisse

outlining the violations of the City's municipal code that she observed and explaining that the violations were required to be remedied before the City would renew plaintiff's business license. Pertinent here, the letter noted the absence of interior landscape islands and perimeter landscaping as required in section 17.606 of the City's Municipal Code (City of Wood Dale Municipal Code § 17.606 (added November 16, 2017)). The notice also identified other code violations at the subject property, including trash collecting in the detention basin, the lack of an enclosure surrounding a dumpster, multiple tractors and trailers parked in excess of 72 hours, and tractors occupying undesignated parking spaces. In the notice, the City recognized that, on November 17, 2017, plaintiff submitted a permit application to construct a dumpster enclosure but stated it would not issue the permit for the dumpster enclosure until the other code violations were remedied. Gullo testified that when she received the June 21, 2018, letter from the City, it "was the first time that we heard about landscaping islands." Dudek testified that the installation of landscape islands would decrease the number of parking spaces, would trigger new stormwater detention calculations, and would "be a costly project to put in."

¶ 21    Chrisse testified at length during the administrative hearing regarding the requirements of the Municipal Code, including on the requirement of landscape islands. She explained that the portion of the Municipal Code governing parking lots requires that any more than 20 consecutive parking spaces be broken up with a landscape island. Additionally, landscape islands were required at the end of each parking row, as well as around the perimeter of the property.

¶ 22    Chrisse acknowledged that the City had issued a business license to plaintiff for the 2016 calendar year, as well as a business license that was valid from January 1, 2017, to October 31, 2017. She explained that, in November 2016, responsibility for handling business licensing was transferred from the City Clerk to the Department. Thus, the City Clerk's office was the issuer of

plaintiff's 2016 business license, but the Department issued plaintiff's business license for January 1, 2017, through October 31, 2017. Chrisse testified that, when the Department became responsible for handling business licensing, the city council "directed staff to be more lenient for that first transition, [and] so we didn't conduct any inspections for the first [business license] issuance."

¶ 23    The license issued by the Department for the period of January 1, 2017, to October 31, 2017, stated it was "Approved Per Truck Trailer Parking Exhibit A Dated March 21, 2017," which was a "parking plan" drawing of the subject property. Chrisse identified at the hearing a prior "parking plan" dated March 2, 2017, upon which she had made handwritten notes identifying certain changes that were required in order to issue plaintiff a 2017 business license. She testified that, after her review, she "was trying to simplify and identify what needed to be corrected so we could issue the license." She agreed that none of her handwritten notes referenced landscape islands. The updated parking plan, which was dated March 21, 2017, was attached to the business license. That parking plan also did not include or note any landscape islands. Chrisse conceded that, because she reviewed the parking plan submitted by plaintiff when it applied for a 2017 business license, she would not have needed to visit the property in order to learn that there were no landscape islands.

¶ 24    Chrisse further testified that the impetus for her on-site inspection of the subject property was plaintiff's October 2017 application for a business license. Thereafter, when the violations had not been corrected as of June 21, 2018, the City issued its violation notice and notice to appear at the administrative hearing that is the subject of this appeal. Chrisse testified that because the operation of the subject property as a commercial truck parking lot was intended to be temporary, "Mr. Forrest may have allowed some leniencies" concerning code compliance in 2011, when the City issued plaintiff a building permit to construct the parking lot.

¶ 25    On November 1, 2018, at the conclusion of an administrative hearing, the hearing officer found plaintiff liable for operating a business without a valid business license in violation of section 4.302 the City's Municipal Code and assessed plaintiff a $500 fine. The hearing officer stated that its ruling was primarily based on the undisputed fact that the subject property was noncompliant with section 17.606 of the City's Municipal Code because it lacked landscape islands and perimeter landscaping. It acknowledged that, although there were other code violations noted in the June 21, 2018, citation, they were "trivial." In so ruling, the hearing officer rejected plaintiff's equitable estoppel defense and found that the City was not estopped from requiring plaintiff to install landscape islands and perimeter landscaping as a precondition to the issuance of a business license.

¶ 26    In reaching its determination, the hearing officer found that, based on the conversations between the parties and the documentary evidence presented, plaintiff and the City both understood that the parking lot "was a temporary issue [and] *** not something that was going to be permanent." The hearing officer stated that it did not believe that John Forrest had the authority to issue a building permit that conflicted with the City's ordinances but that, nevertheless, it was clear to plaintiff "that at some point they had to either comply or they were going to sell it or do whatever they were going to do to develop [the subject property]." The hearing officer continued that the parties "always knew, based on their conversations, ***that the use that this property is being used for was a temporary use that was going to, at some point, change. And if it doesn't change, it can't go on." It stated that the violation and notice to appear "put [plaintiff] on notice that the temporariness of their license ended," and that the "[C]ity determined that the temporary use of what it was being used for is over."

¶ 27    On December 4, 2018, plaintiff timely filed in the circuit court a two-count complaint, with Count 1 seeking administrative review and Count 2 seeking injunctive relief. The trial court held the issue of injunctive relief in abeyance while it addressed the issue of administrative review. On October 7, 2019, the court affirmed the decision of the hearing officer in a written memorandum opinion and order. The City then moved to dismiss plaintiff's claim for injunctive relief, and the trial court dismissed the claim on May 7, 2020. Plaintiff moved for reconsideration of the court's October 7, 2019, order, which the court denied on July 15, 2020.

¶ 28    On August 13, 2020, plaintiff timely filed a notice of appeal.

¶ 29                                III. ANALYSIS

¶ 30    On appeal, plaintiff is challenging only the administrative decision and the trial court's affirmance of the decision. Plaintiff does not challenge the dismissal of its claim for injunctive relief. Plaintiff argues on appeal that the administrative law judge erred in finding that the doctrine of equitable estoppel did not apply to prevent the City from requiring installation of landscape islands, and therefore it was not liable for not having a business license.

¶ 31                    A. Appeal Not Barred by *Res Judicata* or Mootness

¶ 32    The City argues that we should affirm the administrative decision because plaintiff's equitable estoppel claim is moot and precluded by the doctrines of *res judicata* and collateral estoppel. The City's mootness claim is predicated on the application of the other doctrines. The City argues that it initiated a separate administrative proceeding in administrative Case No. 2020-AD-008 for failure to obtain a business license based on the failure to install landscape islands (2020 case). Plaintiff was served with a Code Violation and Notice to Appear on August 19, 2020, and an administrative order was entered on March 23, 2021, in favor of the City. Plaintiff did not seek judicial review of the administrative order. The City maintains that a final judgment has been

obtained in the 2020 case and that there is an identity of parties and cause of action in the 2020 case and the instant case (2018 case).

¶ 33   *Res judicata* is separated into two distinct doctrines: true *res judicata*, also known as claim preclusion, and collateral estoppel, also known as issue preclusion. *Hayes v. State Teacher Certification Board*, 359 Ill. App. 3d 1153, 1161 (2005). "Both branches serve the same purpose, that is, promoting judicial economy and preventing repetitive litigation, and both apply to administrative decisions that are adjudicatory, judicial, or quasi-judicial." *Id.* "Both collateral estoppel and *res judicata* are equitable doctrines; thus, even if the threshold requirements are met, the doctrines should only be applied as fairness and justice require." *Yorulmazoglu v. Lake Forest Hospital*, 359 Ill. App. 3d 554, 563 (2005). "Administrative decisions have *res judicata* and collateral estoppel effect where the administrative determination is made in proceedings that are adjudicatory, judicial, or quasijudicial in nature." *Village of Bartonville v. Lopez*, 2017 IL 120643, ¶ 71. "[A] party claiming *res judicata*—as the party bearing the burden of showing that *res judicata* applies—has a duty to clarify the record so as to *clearly* demonstrate his entitlement to the doctrine's application." (Emphasis in original and internal quotation marks omitted.) *Richter v. Prairie Farms Dairy, Inc.*, 2016 IL 119518, ¶ 36 (quoting *Hernandez v. Pritikin*, 2012 IL 113054, ¶ 52).

¶ 34   Three requirements must be satisfied for claim preclusion to apply: "(1) a final judgment on the merits has been rendered by a court of competent jurisdiction; (2) an identity of cause of action exists; and (3) the parties or their privies are identical in both actions." *Hudson v. City of Chicago*, 228 Ill. 2d 462, 467 (2008). "*Res judicata* bars not only what was actually decided in the first action but also whatever could have been decided." *Id.* "Separate claims will be considered

the same cause of action for purposes of *res judicata* if they arise from a single group of operative facts." *River Park, Inc. v. City of Highland Park*, 184 Ill. 2d 290, 311 (1998).

¶ 35    Claim preclusion may bar not only a claim by a plaintiff but also an affirmative defense to the plaintiff's claim. The Supreme Court has held that, under federal law, claim preclusion may bar a defense where the prior and subsequent actions involve the same claims, while also recognizing that a scenario in which the subsequent action is not likewise barred by claim preclusion would be relatively uncommon. *Lucky Brand Dungarees, Inc. v. Marcel Fashions Group, Inc.*, 590 U.S. ___,140 S. Ct. 1589, 1597 n.3 (2020). Additionally, our supreme court has previously applied the doctrine of claim preclusion to prohibit the application of equitable estoppel. *Rein v. David A. Noyes & Co.*, 172 Ill. 2d 325, 336 (1996) (plaintiffs were prohibited by the doctrine of claim preclusion from raising the issue of equitable estoppel in response to defendant's claim that the statute of limitations had run on plaintiffs' state securities fraud action).

¶ 36    We do not believe the doctrine of claim preclusion is applicable in this case. The 2020 case was directed at code violations beginning on November 2, 2018, after the entry of the September 25, 2018, administrative order in the 2018 case.  As such it did not involve the same cause of action for the purposes of claim preclusion. *Wilmington Savings Fund Society, FSB as Trustee of Residential Credit Opportunities Trust III v. Barrera*, 2020 IL App (2d) 190883, ¶ 19 (a continuing course of misconduct gives rise to a new cause of action where the misconduct continues after judgment has been entered in the first cause of action). Additionally, for the purposes of claim preclusion, a trial court order may constitute a final adjudication on the merits despite the fact that an appeal of that order is pending. *Wiseman v. Law Research Service, Inc.*, 133 Ill. App. 2d 790, (1971). ("A judgment of a trial court in Illinois can be *res judicata* or serve as a basis for an estoppel by judgment, even though such judgment is being appealed."); see *State Life Insurance*

*Co. v. Board of Education of Chicago*, 401 Ill. 252, 257 (1948)) ("The rule has been settled that where a judgment in one case has successfully been made the basis for the judgment in a second case, the second judgment will stand as *res judicata*, although the first judgment be subsequently reversed."). Accordingly, for the purposes of claim preclusion, the 2018 case produced a final order, before the 2020 case, and as such, the 2020 case would not preclude the 2018 case even if they involved the same claims.

¶ 37    Unlike finality for claim preclusion, " '[f]or purposes of applying the doctrine of collateral estoppel, finality requires that the potential for appellate review must have been exhausted.' " *In re A.W.*, 231 Ill. 2d 92, 100 (2008) (quoting *Ballweg v. City of Springfield*, 114 Ill. 2d 107, 113 (1986)). The City maintains that plaintiff failed to seek review of the administrative order in the 2020 case and that it is therefore a final order for the purposes of collateral estoppel. We agree that the trial court order in the 2020 case is final for purposes of collateral estoppel, however, we do not believe that the City has provided a sufficient record to otherwise support its collateral estoppel claim. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391–92 (1984) ("[A]n appellant has the burden to present a sufficiently complete record of the proceedings at trial to support a claim of error, and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis.").

> "[A] party seeking to invoke collateral estoppel must show that: (1) the issue was raised and litigated in a previous proceeding; (2) that the determination of the issue was a critical and necessary part of the final judgment in a prior trial; and (3) the issue sought to be precluded in a later trial is the same one decided in the previous trial." *People v. Jones*, 207 Ill. 2d 122, 139 (2003).

Because of the deficiencies in the record, we cannot determine whether the issue of equitable estoppel was raised and litigated in the 2020 case. Likewise, we cannot say whether the determination of that issue was critical and necessary to the judgment. We do not have a transcript of the administrative proceeding, briefs from the administrative proceeding, or any indication in the administrative order that the matter of equitable estoppel was considered. The City points to plaintiff's motion to stay enforcement of judgment from the 2020 case in support of its position that the cases involved the same issue. The City maintains that plaintiff acknowledged that the issues were the same. However, the page where this admission is supposed to have been made appears to have been left out of the record. Regardless, our analysis turns not on whether plaintiff raised the issue. Even if the issue were raised, the City must show that the issue was a critical and necessary part of the administrative judgement in the 2020 case, and we cannot determine that from a passing representation in a collateral proceeding before a different tribunal. As such, neither issue preclusion nor claim preclusion prevent us from reaching the issue on appeal.

¶ 38    Finally, as the City's mootness claim was based entirely on the application of *res judicata*, it necessarily fails, and we will entertain plaintiff's equitable estoppel argument.

¶ 39                                  B. Standard of Review

¶ 40    Pursuant to the Illinois Municipal Code (65 ILCS 5/1-2.1-7 (West 2018)), a final administrative decision that a municipal code violation occurred is subject to judicial review under the terms of the Administrative Review Law (735 ILCS 5/3-101, *et seq.* (West 2018)). In administrative review cases, our role is to review the administrative decision, and not that of the circuit court. *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 531 (2006). Judicial review of the decision of an administrative agency "shall extend to all questions of law and fact presented by the entire record before the court. *** The findings and conclusions of the

administrative agency on questions of fact shall be held to be *prima facie* true and correct." 735 ILCS 5/3-110 (West 2018).

¶ 41    The degree of deference afforded to the administrative agency's decision turns on the question presented, namely: whether the question presented is a question of fact, a question of law, or a mixed question of law and fact. *Marconi*, 225 Ill. 2d at 532; *City of Belvidere v. Illinois State Labor Relations Board*, 181 Ill. 2d 191, 204 (1998). An administrative agency's findings regarding questions of fact are deemed to be *prima facie* true and correct, and, accordingly, we review such factual findings under the manifest-weight-of-the-evidence standard. *City of Belvidere*, 181 Ill. 2d at 205. An agency's findings and conclusions regarding questions of law, on the other hand, are reviewed *de novo*. *Id*. A review of a mixed question of law and fact, which involves an examination of the legal effect of a given set of facts, is evaluated under the clearly erroneous standard of review. *Id*. "A mixed question is one where the facts are admitted, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard or whether the rule of law is violated when applied to the established facts." *Medponics Illinois, LLC v. Department of Agriculture*, 2021 IL 125443, ¶ 29. As this case involves a mixed question, the clearly erroneous standard applies.

¶ 42    A clearly erroneous standard of review is "between the manifest-weight-of-the-evidence standard and a *de novo* standard, so as to provide 'some deference' to the agency's decision." *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 392 (2001) (quoting *City of Belvidere*, 181 Ill. 2d at 205). This standard is largely deferential, but it does not mean that we must blindly defer to the agency's decision. *Id.* at 395. A decision by an administrative agency is clearly erroneous "only where the reviewing court, on the entire record, is 'left with the definite and firm conviction that a mistake has been committed.' " *Id.* (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). Further we may affirm

based on any grounds apparent in the record. *People v. Johnson*, 208 Ill. 2d 118, 132 (2003). No matter the standard of review, "a plaintiff to an administrative proceeding bears the burden of proof, and relief will be denied if he or she fails to sustain that burden." *Marconi*, 225 Ill. 2d at 532-33. The party claiming estoppel has the burden of proving it by clear and convincing evidence." *In re Scarlett Z.-D.*, 2015 IL 117904, ¶ 26.

¶ 43                                   C. Equitable Estoppel

¶ 44     Generally speaking, the doctrine of equitable estoppel prevents a party from asserting rights where the assertion of those rights would work a fraud or injustice on another party. *Victor Township Drainage District 1 v. Lundeen Family Farm Partnership*, 2014 IL App (2d) 140009, ¶ 47. Although equitable estoppel is applicable to municipalities (*Kenny Construction Co. of Illinois v. Metropolitan Sanitary District of Greater Chicago*, 52 Ill. 2d 187, 197 (1971)), its use against municipalities is disfavored (*Corbin v. Schroeder*, 2021 IL 127052, ¶ 41). Accordingly, "[w]hen invoked against a governmental entity exercising its governmental functions, estoppel will only apply in extraordinary or compelling circumstances." *Chappell v. Board of Trustees of Illinois Municipal Retirement Fund*, 2020 IL App (1st) 192255, ¶ 47; *Morgan Place of Chicago v. City of Chicago*, 2012 IL App (1st) 091240, ¶ 33. Courts are reluctant to apply the doctrine against governmental entities because too frequent application could " 'impair the functioning of the State in the discharge of its government functions, and that the valuable public interests may be jeopardized or lost by the negligence, mistakes or inattention of public officials.' " *Brown's Furniture, Inc. v. Wagner*, 171 Ill. 2d at 431-32 (quoting *Hickey v. Illinois Central R.R. Co.*, 35 Ill. 2d 427, 447-48 (1966)).

¶ 45     Although the general rule is that a municipality cannot be estopped by an act of its agent beyond his or her conferred authority, our supreme court has stated that this rule is not absolute.

*Cities Services Oil Co. v. City of Des Plaines*, 21 Ill. 2d 157, 161 (1961). Courts will apply equitable estoppel against a municipality if the plaintiff can establish: "(1) an affirmative act by either the municipality itself or an official with express authority to bind the municipality; and (2) reasonable reliance upon that act by the plaintiff that induces the plaintiff to detrimentally change its position." *Patrick Engineering, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 35.[1] In addition to these elements, "a public body will be estopped only when necessary to prevent fraud or injustice, particularly when public revenues are involved." *Id*. Whether equitable estoppel should be applied against a municipality in a particular case must be made on an individual basis, after considering all of the circumstances of the case. *Morgan Place*, 2012 IL App (1st) 091240, ¶ 33. "If under all of the circumstances, the affirmative acts of the public body have created a situation where it would be inequitable and unjust to permit it to deny what it has done or permitted to be done, the doctrine of estoppel may be applied against it." *Stahelin v. Board of Education*, 87 Ill. App. 2d 28, 39 (1967).

¶ 46     Plaintiff maintains that the City should be estopped from requiring plaintiff to install the landscape islands. It stresses that the City did not require the installation of such landscape islands or perimeter landscaping when plaintiff initially obtained a building permit to construct the subject property in 2011, when petitioner obtained an extension of the building permit, or when the City

---

[1]While a six-element test is ordinarily used to determine whether equitable estoppel has been established (see *In re Scarlett Z.-D.*, 2015 IL 117904, ¶ 25), in instances where equitable estoppel is asserted against a municipality this two-prong test is used. See, *e.g.*, *Corbin*, 2021 IL 127052, ¶ 41.

issued business licenses to plaintiff in January 2016 and March 2017. Plaintiff maintains that these actions induced it to detrimentally change its position.

¶ 47    Plaintiff also argues that it reasonably relied on the city's actions when it developed the property. It points to Gullo's testimony that it would not have made sense to proceed with the project if they had known about the requirement of landscape islands. Likewise, it points to Dudek's testimony that the installation of the islands would decrease the number of parking spaces, trigger new stormwater detention calculations, and cost a substantial amount of money to implement.

¶ 48    Additionally, plaintiff argues that while not dispositive of the issue at hand, the City did issue business licenses in 2016 and 2017 without requiring the installation of landscape islands, and that nothing had fundamentally changed between then and 2018 when plaintiff was denied a business license. Plaintiff maintains that it had the right to know the costs and requirements at the time of the permitting process in order to determine whether to move forward with the project.

¶ 49    Plaintiff relies on *Cities Services*, which is a leading Illinois supreme court case on the doctrine of equitable estoppel as applied to municipalities. There, the plaintiff purchased property in the city of Des Plaines upon which it wished to construct a gasoline station. *Cities Services*, 21 Ill. 2d 157, 158 (1961). The seller had already received a building permit for construction of a gasoline station on the property, and the building commissioner approved transfer of the permit to the plaintiff after the sale of the property. *Id*. at 158-59. Three weeks after construction began, the city halted the work, and the mayor revoked the permit, because the gasoline station would be less than 300 feet from a church, in violation of a city ordinance. *Id*. By the time the permit was revoked, the footings, foundation work, tank installation, underground plumbing, and rough grading of the property had been completed. *Id*. at 159. Also, plaintiff had spent over $5300 on the

construction, and it would cost over $1000 to remove those improvements and restore the property to its former condition. *Id.*

¶ 50    Plaintiff brought suit to enjoin the city from enforcing the ordinance. *Id.* at 158. The evidence showed that, before construction began, plaintiff had unsuccessfully attempted to obtain copies of ordinances relating to service stations, but the city provided it an outdated ordinance which provided for only a 100-foot prohibition. *Id.* at 159-60. In other words, the gas station was being constructed in a location that complied with the old ordinance but violated the ordinance then in place. Plaintiff therefore lacked any knowledge that the work was in violation of any ordinance, and it had undertaken the construction in good faith. *Id.* at 159. The evidence also showed that the presence of a gasoline station would not pose a greater health or safety hazard than other uses permitted in the immediate vicinity of the church, that the Illinois Department of Public Safety provided for a minimum distance of just 85 feet, and that, elsewhere in the city, a gas station was directly adjacent to a church, and another gas station was adjacent to a school, seemingly in violation of the same ordinance. *Id.* at 160. The circuit court concluded that the city was estopped from enforcing the ordinance, reasoning that the plaintiff undertook the work "after affirmative action and apparent approval by the public authorities." *Id.* at 159.

¶ 51    Our supreme court agreed. In affirming, the court concluded that, under the special facts and circumstances presented by the case, it would be "highly unjust to enforce the public right and compel the plaintiff to suffer a substantial loss." *Id.* at 162. It reasoned that plaintiff had "expended large sums of money in reliance upon the permit and the apparent acquiescence by the city officials," that plaintiff made the improvements in good faith after it was induced to believe the project violated no law or ordinance, and that the permit was outstanding for seven months before

it was revoked. *Id*. at 162-63. Thus, our supreme court concluded that application of the doctrine of equitable estoppel against the city was warranted. *Id*. at 163.

¶ 52    Plaintiff also relies on *Marziani v. Lake County Zoning Board of Appeals*, 87 Ill.App.3d 425 (1980). There the plaintiffs had bought a small island near Fox Lake with the intention of constructing a single-family residence. *Id.* at 425. They conferred with the county building and zoning department and were told they would need to build a bridge to the island from the mainland before a building permit could be issued. *Id.* The plaintiffs did so and expended $5000 constructing the bridge. *Id.* A building permit was then issued and plaintiffs "proceeded to construct a private roadway, septic system, well and pumping facilities, install electric poles, conduct soil tests and employ engineering services at costs totaling $7,700." *Id.* at 425-26, That permit expired in 1970, and the plaintiffs obtained a new permit in 1973. *Id.* at 426. The plaintiffs then began rebuilding the road, installing oak pilings, purchased lumber and equipment, constructed forms for pouring footings which were inspected and approved by the Lake County Building Inspector on November 16, 1973, excavated a site for installation of a crane, and worked on pouring the forms during the period from April to August 1974." *Id.* Before construction of the home was complete, the county revoked the plaintiffs' permit on the basis that the construction of a single-family dwelling in a flood plain was against the Lake County's zoning ordinance. *Id.*

¶ 53    The plaintiffs argued that the county should be estopped from revoking their permit and the court agreed, finding that the plaintiffs had acted in good faith and were induced to act by county officials in that the plaintiffs were advised they would need to construct a bridge before the first permit could be issued, constructed a bridge, and received their permit. *Id.* at 427-29. The plaintiffs applied to renew their permit in 1973, and their request was granted by the county. *Id.* at 429. They then proceeded to seek and obtain another permit for a septic system. *Id.* Likewise, the

county building inspector inspected and approved the work done after the plaintiffs made certain adjustments to the footings. *Id.* The court also emphasized that the County allowed work to be performed under the 1973 permit for 11 months before revoking the permit. *Id.* Additionally, the court considered the zoning ordinance at issue to be ambiguous and capable of being interpreted as allowing the construction of a single-family residence so long as the floor of the structure was raised above the flood stage. *Id.* at 428.

¶ 54    There are several factors which distinguish *Marziani* and *Cities Services* from the instant case. First, both of those cases involved a good faith basis for the property owners to believe that their intended use of the property was permitted under local law. In *Cities Services* the owners were provided with an outdated version of the ordinance by the city, and in *Marziani*, the ordinance was ambiguous. There is no indication in the instant case that Plaintiff had any reason to believe that landscape islands were not required under the applicable ordinances, beyond the fact that they had been issued a permit.

¶ 55    *Cities Services* makes it clear that when "one is aware of the applicable ordinance, or makes no attempt to know of it, the issuance of a permit contrary thereto does not create an estoppel ***" and that "the mere issuance of an unauthorized permit and reliance thereon to one's injury does not provide grounds for relief." 21 Ill. 2d at 163. The City argues that Dudek testified that he was aware of the City's landscaping requirements and therefore, was not justified in relying on the issuance of the permits regarding the requirements for the project. We do not believe this accurately characterizes Dudek's testimony. Dudek was asked if he was familiar with the City's landscaping requirements and if he knew the code requirements for an asphalt parking lot. He answered that he was. He was not asked if he was aware of those requirements during the construction of the parking lot. There is nothing in the record indicating that Dudek or plaintiff

were aware of the requirements prior to the completion of construction. However, there is also nothing to indicate that Dudek or plaintiff undertook to learn of those requirements and were somehow misled.

¶ 56    *Marziani* and *Cities Services* are further distinguishable in that the enforcement of the ordinances in those cases would have completely barred the property owners from using their properties for the purposes they had been purchased for, and for which they had incurred significant costs. In the instant case, the installation of landscape islands would not materially alter the use of the property. It could still be used to park trucks.

¶ 57    One factor which does favor plaintiff that the *Marziani* and *Cities Services* courts emphasized was the amount of time from the issuance of the permits to the revocation of the permits: seven months in *Cities Services* and eleven months in *Marziani*. In the instant case construction of the parking lot was completed and the business operated for several years before the city sought to enforce its ordinance.

¶ 58    However, that fact alone is not dispositive. In *City of Chicago v. Miller*, the city sought to compel a building owner to make certain improvements to the building in order to bring it into compliance with the city's code. 27 Ill. 2d 211, 212 (1963). The building had been built in 1899 pursuant to a permit issued by the city. *Id.* at 214. The version of the code in effect at the time had been enacted in 1949 and was made applicable to existing buildings in 1956. *Id.* It is not clear when the city sought to compel the improvements, but the owner purchased the property in 1957 and the court's opinion was issued on February 1, 1963. *Id.* The owner argued that the city should be estopped from requiring the improvements, on the basis that the building had been constructed pursuant to a permit issued by the city, and the representations of a city employee that there were no code violations. *Id.*

¶ 59    The supreme court held that, "The mere fact that the building was originally constructed under the authority of a permit issued by the city in no way estops the city from bringing an action to compel compliance with the existing code." *Id.* It likewise held that defendant's reliance on the representation of an unnamed employee from the city's building department that there were no code violations apparent in the building's file could not support his estoppel argument when defendant had made no attempt to ascertain the applicable provisions of the code. *Id.* at 215. As in *Miller*, the mere fact that the parking lot was built pursuant to a permit from the city, does not preclude the City from compelling compliance with its codes. Accordingly, plaintiff cannot show a sufficient affirmative act by the City that would support estoppel.

¶ 60    The City argues that the cost of installing the landscape islands should not be viewed as a loss for the plaintiff in the context of equitable estoppel. Rather, plaintiff retained an unauthorized benefit by operating the parking lot without the proper landscaping.

¶ 61    In support the City cites, *City of Chicago v. Unit One Corp.*, where the city of Chicago had issued permits to Unit One to display commercial signs on the exterior wall of its building for 15 years. 218 Ill. App. 242, 243-44 (1991). When the city filed a complaint alleging that the signs violated a zoning ordinance, Unit One argued that the city should be estopped from enforcing the ordinance because the city had issued sign permits for its signs during the preceding 15 years. It argued that the city's conduct ratified the issuance of the permits, and it had detrimentally relied on the city's action. *Id*. at 245.

¶ 62    The appellate court affirmed the circuit court's ruling in favor of the city. In so holding, the court stated that nothing indicated that the city either actively misled or induced the owner into believing the commercial signs did not violate any zoning ordinance. *Id*. at 247. Although language was stamped onto each permit indicating that the signs "conformed with the zoning ordinance,"

the court stressed that the permit stamp likewise stated that the "[a]pproval of [a]pplication for license shall not be held to permit or be an approval of any Violation of the provisions" of the zoning ordinance. *Id.* It also noted that, "every entity is charged with the responsibility of knowing the limitations of any ordinance under which it is subject." *Id*. (citing *Cities Services*, 21 Ill. 2d 157). The court also stated that the owner did not show that it substantially relied on the sign permits or changed its position due to the unauthorized permits, such that it would be unjust at that point to enforce the zoning ordinance. *Id*. Notably, the building was not constructed in reliance upon the belief that commercial signs on the exterior wall would be permitted, nor was there any indication that the commercial space inside the building was designed in reliance on the sign permits. *Id*. Moreover, the court was unpersuaded by the owner's assertion that, without the permits, it would be unable to attract or retain business, because the argument was directed against the ordinance rather than the city's prior failure to administer it.

> "That [the owner] will now be disfranchised of an advantage to which it had no right in the first place is not the type of loss upon which the concept of estoppel is focused. The fact that the sign ordinance will now be enforced leaves [the owner] in the same position it would have been in had it complied with the law in the first place."

Accordingly, based on these circumstances, the court held that the city should not be estopped from enforcing the zoning ordinance. *Id*.

¶ 63 Following the reasoning of the court in *Unit One*, the costs plaintiff must bear in constructing the landscape islands are not the type of loss which would trigger equitable estoppel, as plaintiff was always obligated under the city's ordinance to have such islands. There is an argument to be made that any increased costs associated with demolishing or redesigning portions of the parking lot might be the type of loss to which equitable estoppel would apply, since those

represent additional moneys which would not need to have been spent had the city enforced the ordinance during the parking lot's initial construction. However, plaintiff has not provided specific estimates for the improvements and thus we have no way of assessing the extent of such costs.

¶ 64    Gullo stated that had the City insisted on the installation of landscape islands when the project was initially being planned, the increased cost and decreased parking space would mean that the project "wouldn't have made sense to develop." However, there was also testimony that the lot had 188 spaces, while plaintiff was only permitted to lease 180 spaces. As there also appears to be space at the end of some of the rows which could accommodate a landscape island, plaintiff has not made it clear how many usable spots would actually be lost by the installation of the islands. Likewise, plaintiff argues that the installation of the islands would trigger new stormwater detention calculations but does not give any indication of the cost involved, or the likelihood that the installation of new islands would require changes to its current plan. In short plaintiff has not provided clear evidence of the harm it would suffer and instead calls for us to speculate regarding the extent of its costs. As such, plaintiff has failed to demonstrate detrimental reliance sufficient to satisfy an equitable estoppel claim.

¶ 65    Accordingly, we find that plaintiff had failed to demonstrate by clear and convincing evidence that the City should be estopped from requiring the installation of landscape islands, and that therefore the administrative law judge's decision was not clearly erroneous.

¶ 66                                III. CONCLUSION

¶ 67    For the reasons stated, we affirm the judgment of the circuit court of Du Page County.

¶ 68    Affirmed.